UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOSHUA JAMES MOORE                          CIVIL ACTION

VERSUS                                      NUMBER: 20-1892

APRIL TOMLIN, ET AL.                        SECTION: "B"(5)

## REPORT AND RECOMMENDATION

Before the Court are the Rule 12(b)(6) motions to dismiss of the named Defendants herein, Nurse April Tomlin, EMT Katie LeBeouf, Lieutenant Tyler Theriot, Medical Director Richard "Petie" Neal, and Major (formerly Warden) Stephen Bergeron of the Terrebonne Parish Criminal Justice Complex ("TPCJC"). (Rec. docs. 12, 13). The motions are opposed. (Rec. docs. 18, 19, 22). For the reasons that follow, it is recommended that Defendants' motions be granted and that Plaintiff's suit be dismissed.

Plaintiff is an inmate of TPCJC who is awaiting trial on unspecified charges. (Rec. doc. 1, p. 3). As his statement of claim herein, Plaintiff alleges as follows:

> [A]round 9:00 p.m. on 6-20-2020 I was on the phone, I hung up the phone, and turned to walk up the stairs an triped on the first step, an landed on my cast, an it cracked, I felt a poping, and burning in my hand, and finger, an noticed that my fingers was bent to the right I called medical, medical took over an hr. to come check on my while I was in pain! When the nurse came back here she told me that the hospital ER did [not] have a casting person on duty until Monday the 6-22-2020, an didn't asses my hand. She told me there was nothing They could do, so now I have to sit in pain till Monday, instead of bringing me to the ER. they went agaist my specilist Dr. orders to bring me stright to the hospital.

(Rec. doc. 1, p. 5).

For the pain and suffering brought about as a result of the Defendants' alleged "medical malpractice" and "medical negligence," Plaintiff seeks $500,000.00 in monetary damages. (*Id.*).

Defendants now move for the dismissal of Plaintiff's complaint pursuant to Rule 12(b)(6), 28 U.S.C. §1915A, and 42 U.S.C. §1997e(c), collectively challenging the sufficiency of Plaintiff's allegations against them in their individual and official capacities and the viability of any civil rights claim for inadequate medical care, and asserting their entitlement to qualified immunity.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for the dismissal of a claim if the plaintiff fails to plead factual allegations in support of his claim that would entitle him to relief.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).  Those "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009), *cert. denied*, 559 U.S. 936 (2010)(quoting *Twombly*, 550 U.S. at 555).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party, *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009), but the Court need not accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.  While a complaint need not contain detailed factual allegations, it does demand more than an unadorned "the-defendant-unlawfully-harmed-me" accusation.  *Id.*  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id.* at 677 (citing *Twombly,* 550 U.S. at 555).  Of particular

importance in a civil rights case like this one is pleading the essential element of personal involvement. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). "To state a cause of action under §1983, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, *specifying the personal involvement of each defendant*." *Jolly v. Klein*, 923 F.Supp. 931, 943 (S.D. Tex. 1996)(emphasis added)(citing *Murphy v. Kellar* 950 F.2d 290, 292 (5th Cir. 1992)). "Determining whether a complaint states a plausible claim for relief ... will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

The statutory provisions, 28 U.S.C. §1915A and 42 U.S.C. §1997e(c), on the other hand, provide for the screening of prisoners' complaints brought against officers or employees of governmental entities and for the dismissal of any claims that are frivolous, malicious, or fail to state a claim upon which relief can be granted.

Because Plaintiff gives no indication in his complaint of the capacity(ies) in which the named Defendants, all officials of the Parish of Terrebonne, were sued, it is generally presumed by operation of law that they are being sued in their official capacity. *Douglas v. Gusman*, 567 F.Supp.2d 877, 888-89 (E.D. La. 2008). "In a suit brought against a municipal official in his official capacity, the plaintiff must show that the municipality has a policy or custom that caused his injury." *Carter v. Strain*, No. 09-CV-0015, 2009 WL 3231826 at *2 (E.D. La. Oct. 1, 2009)(quoting *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007), *cert. denied*, 555 U.S. 813 (2008)). "'A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity.'" *Id.* (quoting *Colle v. Brazos County, Texas*, 982 F.2d 237, 245 (5th Cir. 1993)). Rather, the plaintiff "... must <u>identify</u> the policy or custom which allegedly caused the deprivation of his constitutional rights." *Id.*

(citing *Murray v. Town of Mansura*, 76 Fed.Appx. 547, 549 (5th Cir. 2003) and *Treece v. Louisiana*, 74 Fed.Appx. 315, 316 (5th Cir. 2003)).

Measured against the foregoing standards, Plaintiff's allegations against the named Defendants in their official capacity fail to state a claim upon which relief can be granted, as he does not allege that the purported deprivation resulted from a policy or custom, much less does he identify any such policy or custom. *Carter*, 2009 WL 3231826 at *2. Viewing Plaintiff's allegations as having been made against the Defendants in their individual capacity, he fares no better because "[p]laintiffs suing governmental officials in their individual capacities … must allege specific conduct giving rise to a constitutional violation. This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to the constitutional claims." *Id.* at *1 (quoting *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002)). As noted earlier, personal involvement is an essential element of a civil rights cause of action, *Thompson*, 709 F.2d 382, and the doctrine of *respondeat superior* is simply not a concept that is applicable to §1983 proceedings. *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.), *cert. denied*, 471 U.S. 1126 (1985); *Lozano v. Smith*, 719 F.2d 756, 768 (5th Cir. 1983). It is incumbent upon the plaintiff to specifically illustrate each of the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986); *Jolly*, 923 F.Supp. at 943.

Although Plaintiff names five individuals as Defendants in this suit, the statement of claim in his complaint, which was preceded by the specific instruction that he "[d]escribe how each defendant is involved" (rec. doc. 1, p. 5), fails to provide the required level of illumination to establish §1983 liability on the part of the Defendants in their individual capacity. Not even a vague reference to Lieutenant Theriot or Major Bergeron appears

4

anywhere in Plaintiff's complaint.  As noted earlier, the Defendants in their individual capacities have also specifically invoked their entitlement to qualified immunity.  The doctrine of qualified immunity provides governmental officials performing discretionary functions with a shield against damages for civil liability, provided that their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006)(citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  In determining whether a governmental official is entitled to qualified immunity, the appropriate inquiry is:  (1) whether the plaintiff has demonstrated a violation of a clearly established federal right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known.  *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)).  Those two prongs may be considered in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Once raised, the plaintiff bears the burden of rebutting the qualified immunity defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  *Gobert*, 463 F.3d at 345 (quoting *Estate of Davis v. City of N. Richard Hills*, 406 F.3d 375, 380 (5th Cir. 2005)).

Plaintiff's claim here is that he was deprived of necessary medical care.  In order to establish a constitutional violation, Plaintiff must demonstrate that the Defendants were deliberately indifferent to his serious medical needs, which constituted an unnecessary and wanton infliction of pain.[1/]  *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991).  Deliberate indifference is an "extremely high" standard to meet, *Gobert*, 463 F.3d at 346, one that has been equated with "subjective recklessness" as that term is used in criminal law.  *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997).  A prison official shows

---

[1/] Regardless whether Plaintiff was a pre-trial detainee or a convicted prisoner, the standard regarding the provision of medical care to him is the same. *Hale v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996).

deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted). "An incorrect diagnosis by prison medical personnel [similarly] does not suffice to state a claim for deliberate indifference." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)(citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). If an inmate in fact receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain or other symptoms persist despite the treatment. *Gobert*, 463 F.3d at 345; *Williams v. Chief of Medical Operations, Forrest County Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010), *adopted*, 2010 WL 3171040 (E.D. La. Aug. 6, 2010). That an inmate's medical care "... may not have been the best money could buy" is insufficient to establish a constitutional violation, *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992), and a prisoner is not entitled to medical treatment of his choosing simply upon request. *Stafford v. Kelly*, No. 09-CV-0133, 2011 WL 2633034 at *2 (N.D. Miss. June 3, 2011), *adopted*, 2011 WL 2633174 (N.D. Miss. July 5, 2011). Nor does the failure to provide a specialist in the field of an inmate's choosing state a claim for deliberate indifference. *Green v. McKaskle*, 788 F.2d 1116, 1127 (5th Cir. 1986). And where a §1983 claim is premised on a delay in the provision of medical

care, a prisoner must also establish that he suffered substantial harm as a result of the delay. *Richard v. Martin*, 390 Fed.Appx. 323, 325 (5th Cir. 2010).  "Experiencing 'occasional delays in obtaining' medical treatment is insufficient to prove a refusal of providing medical care when the inmate's … records demonstrate that he received treatment."  *Taylor v. Bexar County*, No. 10-CV-0045, 2011 WL 759549 at *4 (W.D. Tex. Feb. 23, 2011)(quoting *Gobert*, 463 F.3d at 346); *Richard*, 390 Fed.Appx. at 324-25.

To better assess the viability of Plaintiff's claim for deprivation of medical care in the context of the extant motions to dismiss, the Court previously ordered that it, as well as Plaintiff, be provided with a copy of the medical records generated during the time that he was housed at TPCJC. (Rec. doc. 20).   Those copious records, which weigh in at an impressive 1,335 pages, paint the picture of an individual who has been treated for numerous medical conditions during his various stints of incarceration at TPCJC over a 6.5 year period.[2]  (Rec. doc. 21).  Pertinent to this case are records that establish the following: On May 9, 2020, a date on which he was not incarcerated, Plaintiff presented to the Emergency Department ("ED") of the Leonard J. Chabert Medical Center ("LCMC") for treatment of a laceration to the second digit of the left hand that had occurred earlier while he was working on a showerhead.  (TPCJC 1210-1264).  Records from that date reflect that Plaintiff had recently been released from jail where he had been receiving hypertension medication that had since run out.  The assessment was a laceration to the left index finger, without a foreign body or damage to the nail, and hypertension.  Plaintiff was prescribed Keflex, was fitted with an extension splint, and was referred to orthopedics for a possible

---

[2] Plaintiff's past medical history is positive for chronic hepatitis C without hepatic coma, CVA (cerebral vascular accident), debility, depression, a history of psychiatric care and hospitalization, a history of urinary self-catheterization, hypertension, renal disorder (kidney stones), right-sided Bell's palsy, and an undescended testicle.  (TPCJC 1437-1438).

extensor tendon injury. (*Id.*). Pursuant to that referral, on May 19, 2020, Plaintiff underwent repair of the extensor tendon along with incision and drainage ("I & D") by Dr. Mark Meyer. (TPCJC 1185, 1192-1194). Cultures taken at the time came back as positive for MRSA. (TPCJC 1168).

On May 25, 2020, Plaintiff was arrested on an alcohol-related offense and was booked back into TPCJC. (TPCJC 1198, 1265-1268). That same day he was evaluated by medical personnel for complaints of dots in his right eye and his blood pressure was taken. (TPCJC 1208). The following day, Plaintiff was evaluated further by TPCJC medical personnel for his left hand injury. (TPCJC 1207). By that time, treatment records from LCMC pertaining to the injury had been requested by TPCJC officials and received. (*Id.*). The assessment was a laceration to and cellulitis of the left hand. The plan was to start Plaintiff on a course of Keflex and Ibuprofen and to ultimately remove his sutures. (*Id.*).

On June 3, 2020, Plaintiff was transported back to LCMC for follow-up care of his hand. (TPCJC 1187). After being screened for COVID-19 (TPCJC 1184-1186), Plaintiff was admitted to LCMC, where he received IV antibiotics and underwent further left index finger extensor tendon repair along with I & D, again at the hands of Dr. Meyer. (TPCJC 1164-1169, 1191-1198). Plaintiff was discharged and returned to TPCJC on June 5, 2020 and further follow-up care was scheduled. (*Id.*). Four days later, Plaintiff reportedly exposed himself to jail personnel during medication pass-out. (TPCJC 1157).

Plaintiff was returned to the LCMC Orthopedic Surgery Clinic on June 10, 2020 with the chief complaint at the time being identified as left hand infection. (TPCJC 1437-1441, 1444). Plaintiff reported taking Bactrim as prescribed along with overall improvement of his pain. (*Id.*). He also reported getting his hand splint caught in a door which

hyperextended his fingers but he experienced no "pop" and the affected finger remained in extension. (*Id.*). The assessment was left index finger infected Zone V extensor tendon laceration complicated by a re-rupture two weeks after Plaintiff's initial surgery which was followed by repeat tendon repair and I & D. Plaintiff's splint was changed to an extension cast and he was kept on Bactrim. (*Id.*). During medication pass-out on June 12, 2020, Plaintiff advised jail personnel that his cast was pushing down on the sutures in his finger and causing him discomfort and it was decided to send him to the ED for further evaluation. (TPCJC 1436, 1400, 1378). At the ED, Plaintiff complained of pain and numbness to the left second and third fingers for the previous two days. However, no redness, swelling, fever, or drainage were noted and no signs of infection were present. Plaintiff's splint was re-wrapped with an Ace bandage. (TPCJC 1396-1398). That same day, Plaintiff submitted a "Request For Medical Attention Form" ("RFMAF") asking to see Dr. Lo. That form was received by medical staff one hour later and Plaintiff was dutifully placed on the waiting list to see the doctor. (TPCJC 1399). Another RFMAF was submitted by Plaintiff the following day wherein he requested to see the eye doctor after cracking his glasses. Once again, receipt of that form was acknowledged by medical personnel one hour later and Plaintiff was referred for evaluation. On June 17, 2020, Plaintiff was advised that the facility's eye doctor was unavailable until further notice secondary to the COVID-19 pandemic but that a family member would be allowed to pick up his eyeglasses and have them repaired. (TPCJC 1395).

That brings us to Saturday, June 20, 2020, the date of the incident at issue in this litigation. The records provided to the Court include a "Doctors and Nurses note[]" wherein it was documented that at 8:45 p.m., Plaintiff notified the pod officer that his cast

9

was broken. A corporal was dispatched to check on Plaintiff, who related that he had slipped down the stairs and caught himself with his casted hand, causing the cast to break. Just 15 minutes later, jail medical personnel telephoned LCMC to see if anyone was on duty who could re-cast Plaintiff's cast but were told that the casting staff would not be back until Monday, although Plaintiff could be outfitted with a splint if need be. At 9:11 p.m., EMT LeBeouf proceeded to Plaintiff's tier to advise him that the casting personnel at LCMC were not available until Monday, at which point Plaintiff reportedly stated "f_ _ k that yall won't do anything, then I will call my family as my fingers are straight." Plaintiff was reminded that he had received his prescribed dosage of Ultram just 45 minutes before the incident. At 9:30 p.m., Lebeouf reviewed jail surveillance camera footage going back to 7:00 p.m. and could find no evidence of Plaintiff falling down the stairs and breaking his cast as he claimed. (TPCJC 1391-1392). The medical records contain no RFMAFs from Plaintiff on June 21, 2020.

On June 22, 2020, Plaintiff was transported to the Orthopedic Surgery Clinic for a previously-scheduled post-operative evaluation. (TPCJC 1173). There, Plaintiff advised attending medical personnel that he had tripped a few days earlier, causing his splint to become dislodged with an increase in pain. There had been some drainage in the splint but no active drainage at the time of the evaluation. Upon physical examination, Plaintiff's wound was noted to be healing well with no signs of erythema, warmth, drainage, or infection. All sutures were removed and Plaintiff exhibited minimal active flexion and extension of the index finger. Plaintiff's finger was cast in extension for four weeks to provide the tendon the best chance to heal. (TPCJC 1382-1383).

On June 24, 2020, Plaintiff underwent a psychiatric evaluation at TPCJC. (TPCJC 1288). On June 26, 2020, Plaintiff was transported back to the LCMC ED in need of a new cast as he had reportedly taken off or broken his cast. (TPCJC 1376, 1377). At the ED, Plaintiff advised medical personnel that the previous evening he had gotten his cast wet because jail officials had not provided him with the necessary materials to keep it dry. On physical examination, Plaintiff's left index finger appeared to be macerated with the incision healing well with no signs of infection. It was noted that Plaintiff's cast was in place prior to removal. He was fitted with a new plaster cast by a physician's assistant. (TPCJC 1356-1360).

On July 2, 2020, TPCJC medical personnel scheduled an eye doctor appointment for Plaintiff on July 21, 2020. (TPCJC 1354). That same day, Plaintiff submitted another RFMAF requesting a referral to a urologist for right kidney pain and urinary difficulties. That form was received by medical staff that day who were to refer Plaintiff to the physician. On July 6, 2020, it was noted that Plaintiff was already under the care of a urologist. (TPCJC 1355). Two days later, Plaintiff submitted another RFMAF complaining that his hand pain medication had been discontinued and that he was unable to take Ibuprofen due to some liver condition. That form was received by medical personnel that day, who promptly examined Plaintiff, who did not request any pain medication at that time. Plaintiff's chart was examined and it was noted that he had been on Tramadol since May of 2020. Plaintiff was to be referred for a medication review and was placed on a course of Ibuprofen. (TPCJC 1353).

Plaintiff submitted yet another RFMAF on July 20, 2020, this time complaining that his "hand is leaking," that he thought it might be infected, and that the Orthopedic Clinic

should be consulted about the issue. Plaintiff was dutifully evaluated that same day by medical personnel, who noted no leakage. Plaintiff advised the evaluator that he was able to remove his cast and that is when he noticed the leakage. (TPCJC 1352). On July 21, 2020, Plaintiff was formally referred to Dr. Bourg, who ordered him a pair of spectacles that day. (TPCJC 1351). In another medical staff note of that same date it was reported that Plaintiff had been brought to the Medical Department at 4:20 after he complained that his left hand was bleeding, yet no active bleeding was noted upon evaluation. The attending medical personnel observed that Plaintiff had a broken cast around the left thumb area and his left index finger appeared swollen. He was prescribed Keflex and Ibuprofen and it was noted that he had a follow-up appointment at the Orthopedic Surgery Clinic the following day. (TPCJC 1350).

On July 22, 2020, Plaintiff was formally referred to the LCMC Orthopedic Surgery Clinic where he was seen by Dr. Gonzalo Sumarriva. (TPCJC 1348, 1349, 1327). Plaintiff's splint was removed and his wound was noted to be healing well with no signs of erythema, warmth, drainage, or infection. The assessment was status post left index finger extensor tendon repair and left hand wound exploration, irrigation, and debridement with infection being characterized as resolved. Plaintiff was counseled on finger exercises and further follow-up was to be scheduled. (TPCJC 1327). The prognosis for Plaintiff's hand was good. (TPCJC 1348).

On July 23, 2020, Plaintiff was transported back to LCMC for a follow-up appointment at the Urology Clinic. (TPCJC 1432). The assessment was calculus of the kidney and flank pain that was to be monitored. (TPCJC 1330-1343). Notwithstanding the positive findings that were recorded by Dr. Sumarriva just the previous day, the medical

records contain a handwritten note from Plaintiff dated July 23, 2020 complaining that the infection in his hand was getting worse, questioning whether it was necessary for his hand to fall off before he got any attention, and threatening to sue. (TPCJC 1325). That note was received that day by the Medical Department, which promptly evaluated him and observed that Plaintiff had missed several doses of Keflex and Ibuprofen since being prescribed those drugs on July 21, 2020. Medical personnel also observed that Plaintiff had been seen at LCMC for follow-up care just the day before, during which no evidence of infection was found. The dosage of Ibuprofen was increased and Plaintiff was directed to take his prescribed medications as instructed. (TPCJC 1326).

On July 28, 2020, Plaintiff was evaluated further by TPCJC medical personnel, who noted that he had been non-compliant with his Keflex as it reportedly caused him stomach upset. The assessment was left hand cellulitis and status post extensor tendon repair. Bactrim DS was substituted for Keflex and Plaintiff was sent to LCMC for further evaluation of his finger. (TPCJC 1324). There, Plaintiff was first seen by Dr. Melvin Chu, an Internal Medicine specialist, for complaints of worsening left index finger pain along with a decrease of movement. Dr. Chu noted that Plaintiff had been prescribed Keflex by TPCJC officials but would not take it, requesting IV antibiotics instead. Plaintiff reported to the doctor that he had in fact been taking Keflex but a record of him doing so was not documented by jail personnel. Upon physical examination, Plaintiff had swelling to the left second digit PIP/MCP and a 3mm ulceration on the dorsal aspect with some drainage and some loss of sensation distally and proximally to the wound. The initial assessment was finger pain of the second left index finger with a differential diagnosis of malingering. Compliance with Keflex was questionable. The clinical impression was a non-healing

13

wound of the left upper extremity, subsequent encounter, and an abscess of the left index finger.  (TPCJC 1305-1312).

At Dr. Chu's request Plaintiff was also re-evaluated by Dr. Sumarriva at the Orthopedic Surgery Clinic.  He found Plaintiff's wound to be healing well with mild drainage and erythema but infection was said to be resolved.  Plaintiff was continued on a three-week course of Bactrim DS and was counseled on wound care measures to be performed in prison.  (TPCJC 1317).  Tramadol was also prescribed.  (TPCJC 1320).  A further follow-up appointment at the Orthopedic Clinic was scheduled for September 2, 2020.  (TPCJC 1322).

It is against the backdrop of the foregoing medical records, records upon which the Court may properly rely, *Gobert*, 463 F.3d at 346 n. 24,[3/] that the sufficiency of Plaintiff's allegations against the named Defendants is analyzed.  Initially, the Court notes that the sheer volume of the medical records that were generated while Plaintiff was housed at TPCJC quite easily belie any credible claim of deliberate indifference.  *Mathis v. Barry*, No. 18-CV-1078, 2019 WL 3307134 at *5 (N.D. Tex. Jun. 10, 2019).  That having been said, in this case Plaintiff alleges, first, that after experiencing a "trip and fall" which resulted in the cracking of his cast, he called "medical" which took over an hour to appear and evaluate his condition.  The delay complained of by Plaintiff is refuted by the contemporaneous medical records that are before the Court.  In any event, delays in obtaining non-emergent medical care are a fact of life routinely experienced by both prisoners and non-prisoners alike. *Dickerson v. Murray*, No. 11-CV-0078, 2012 WL 131416 at *11 (E.D. Tex. Feb. 28, 2012), *adopted*, 2012 1314109 (E.D. Tex. Apr. 16, 2012).  Thus, even if true, the one-hour lag in

---

[3/] "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference."  *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

evaluating Plaintiff's condition fails to rise to the level of a constitutional violation. After being evaluated, Plaintiff secondly complains that "the nurse" informed him that the emergency room of the local hospital did not have an individual who was appropriately trained to outfit Plaintiff with a new cast on duty until Monday. TPCJC personnel obviously have no control over the hospital's staffing decisions and based upon a review of Plaintiff's medical records, he was dutifully taken to the hospital on the Monday following his Saturday night fall whereupon he was fitted with a new cast. (Rec. doc. 1, pp. 5, 9, 10). Substantial harm is not borne out by the medical records that were generated subsequent to June 20, 2020 and the 1.5 day delay complained of by Plaintiff falls woefully short of establishing a constitutional violation. *Fenlon v. Quarterman*, No. 07-CV-0532, 2008 WL 637627 (E.D. Tex. Mar. 5, 2008), *aff'd*, 350 Fed.Appx. 931 (5th Cir. 2009)(delays of 43 days and six months in providing surgery for abdominal aneurysm and malignant lump did not amount to deliberate indifference). "It has consistently been held that an inmate who has been examined by medical personnel fails to set forth a valid showing of deliberate indifference to serious medical needs," *Gillis v. Goodwin*, No. 13-CV-2506, 2015 WL 3622675 at *3 (W.D. La. Jun. 9, 2015), and a prisoner's disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a claim for deliberate indifference to serious medical needs. *Id.* at *2 (citing *Norton*, 122 F.3d at 292).

As observed by the Fifth Circuit,"[c]ontinuing … pain is unpleasant. Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred." *Mayweather* 958 F.2d at 91. In short, the determinative issue here is not whether the medical care that Plaintiff received was substandard in some respect, whether his medical problems or pain persisted, or whether he was dissatisfied with the timeline within which

such care was provided; rather, it is only whether his serious medical needs were met with deliberate indifference <u>by</u> <u>the</u> <u>named</u> <u>Defendants</u>.  Based upon the record that is presently before it, the Court easily answers that question in the negative.

## RECOMMENDATION

For the foregoing reasons, it is recommended that Defendants' motions be granted and that Plaintiff's lawsuit be dismissed for failing to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), §1915A(b)(1) and §1997e(c)(1).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[4]

New Orleans, Louisiana, this __12th__ day of _____January_____, 2021.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[4] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.